## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| MATTHEW MEDNEY, Derivatively on Behalf of HUT 8 CORP., | Case No: |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| BILL TAI, MIKE HO, ASHER GENOOT, ALEXIA HEFTI, JOSEPH FLINN, MAYO A. SHATTUCK, III, STANLEY O'NEAL, AMY WILKINSON, RICK RICKERTSEN, JAMIE LEVERTON, and SHENIF VISRAM, | |
| Defendants, | **JURY TRIAL DEMANDED** |
| and, | |
| HUT 8 CORP., | |
| Nominal Defendant. | |

Plaintiff Matthew Medney ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Hut 8 Corp. ("Hut 8" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from November 9, 2023 and January 18, 2024 (the "Relevant Period") and have caused substantial harm to the Company.

2.     Hut 8 is a crypto currency and data mining company.  The Company is engaged in Bitcoin mining and hosting, managed services, energy arbitrage, and operating traditional data centers. The Company operates computing infrastructure which mines Bitcoin and delivers computing services to enterprise customers.

3.     Hut 8 formed following the November 2023 merger of Hut 8 Mining Corp. ("Legacy Hut") and U.S. Data Mining Group, Inc. d/b/a US Bitcoin Corp. ("USBTC") (the "Merger").  USBTC held a 50% interest in a joint venture bitcoin mining facility, located in King Mountain, Texas (the "King Mountain JV"), which was acquired in the Merger.

4.     On January 18, 2024, at approximately 10:30 AM EST, *J Capital Research* published a report which alleged, *inter alia*, that Hut 8's merger with USBTC was premised on a number of alleged misstatements, including (a) that the USBTC had an "undisclosed related party" as one of its largest shareholders, (b) that one of USBTC's core assets, the King Mountain JV, "has historically failed to provide energy and high-speed internet," and (c) that the Company had misstated certain finances of the King Mountain JV by failing to account for certain interest expenses.  Citing individuals "highly familiar" with USBTC, the report stated that, without the Merger, USBTC would have undergone bankruptcy and that USBTC had a value estimated to be 70% less than the approximately $745 million that Hut 8 paid to acquire it.

2

5.      On this news, the Company's stock price dropped $2.16 to close at $7.12 per share on January 18, 2024.

6.      Throughout the Relevant Period, Individual Defendants (defined below) made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  The Individual Defendants failed to disclose to investors that: (a) one of USBTC's largest shareholders is an undisclosed related party; (b) USBTC's core asset has historically failed to provide energy and high-speed internet; (c) that the profitability of certain USBTC assets were overstated; and (c) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION

7.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)).

9.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     Venue is proper in this Court because: (a) the Company maintains its principal place of business in this District; (b) one or more of the defendants either resides in or maintains executive offices in this District; (c) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (d) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

12.     **Plaintiff Matthew Medney** is, and was at relevant times, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

*13.*     **Nominal Defendant Hut 8** is incorporated under the laws of Delaware, with its principal executive offices located in Miami, Florida.

### Director Defendants

14.     **Defendant Bill Tai** ("Tai") serves as Chairman of the Board of Directors (the "Board") and has served as a member of the Board at all relevant times.  Defendant Tai also serves as a member of the Board's Nominating, Environmental, Social and Governance Committee.

4

15. **Defendant Mike Ho** ("Ho") has served as a member of the Board and as the Company's Chief Strategy Officer ("CSO") at all relevant times.  Prior to joining Hut 8, Defendant Ho co-founded and served as CEO and board chair of USBTC.  According to Defendant Ho's Employment Agreement, dated November 30, 2023, Defendant Ho is entitled to receive $490,000 in total compensation from the Company, consistently entirely of base salary.

16. **Defendant Asher Genoot** ("Genoot") has served as the Company's President and as a member of the Board at all relevant times.  On February 6, 2024, the Company appointed Genoot as Chief Executive Officer ("CEO").  Defendant Genoot is a co-founder of USBTC and, from 2020 to 2023, served as USBTC's President and as a director.  According to Defendant Genoot's Employment Agreement, dated November 30, 2023, Defendant Genoot is entitled to receive $490,000 in total compensation from the Company, made up entirely of base salary.

17. **Defendant Alexia Hefti** ("Hefti") has served as a member of the Board at all relevant times.  Defendant Hefti also serves as a member of the Board's Nominating, Environmental, Social and Governance Committee.

18. **Defendant Joseph Flinn** ("Flinn") has served as a member of the Board at all relevant times.  Defendant Flynn also serves as Chair of the Board's Audit Committee.

19. **Defendant Mayo A. Shattuck, III** ("Shattuck") has served as a member of the Board at all relevant times.  Prior to joining Hut 8, Shattuck served in a leadership role with USBTC for "Web 3.0."  Defendant Shattuck also serves as Chair of the Board's Compensation and Talent Development Committee.

20.     **Defendant Stanley O'Neal** ("O'Neal") has served as a member of the Board at all relevant times.  Prior to joining Hut 8, O'Neal served as a director of USBTC.   Defendant O'Neal also serves as a member of the Board's Audit Committee.

21.     **Defendant Amy Wilkinson** ("Wilkinson") has served as a member of the Board at all relevant times.  Prior to joining Hut 8, Wilkinson served as a director of USBTC.  Defendant Wilkinson also serves as Chair of the Board's Nominating, Environmental, Social and Governance Committee and as a member of the Compensation and Talent Development Committee.

22.     **Defendant Rick Rickertsen** ("Rickertsen") has served as a member of the Board at all relevant times.  Defendant Rickertsen also serves as a member of the Board's Compensation and Talent Development Committee.

23.     Defendants Tai, Ho, Geenot, Hefti, Flinn, Shattuck, O'Neal, Wilkinson and Rickertsen are herein referred to as the "Board Defendants".

**Officer Defendants**

24.     **Defendant Jamie Leverton** ("Leverton") served as CEO of the Company until February 6, 2024, when the Company notified her of her termination, without cause. Defendant Leverton served as a member of the Board until her resignation effective February 12, 2024.

25.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme were exposed, Defendant Leverton made the following sales of Company stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price | Proceeds |
|------|------------------|-----------|----------|
| 12/22/2023 | 98,724 | $14.21 | $1,402,966 |
| 01/12/2024 | 35,761 | $10.10 | $361,257 |

26.     In total, Defendant Laverton sold 134,485 shares of Company stock on inside information, for which she received approximately $1,764,223 in proceeds.

27.     ***Defendant Shenif Visram*** ("Visram") has served as the Company's Chief Financial Officer ("CFO") at all relevant times.

28.     According to Defendant Visram's Employment Agreement, dated November 30, 2023, Defendant Visram is entitled to receive $375,000 in total compensation from the Company, made up entirely of base salary.

29.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme were exposed, Defendant Visram made the following sale of Company stock:

| Date | Number of Shares | Avg. Price | Proceeds |
|------|------------------|------------|----------|
| 12/22/2023 | 17,897 | $14.14 | $253,063 |

30.     In total, Defendant sold 17,897 shares of Company stock on inside information, for which he received approximately $253,063 in proceeds.

31.     Defendants Leverton and Visram are sometimes referred to herein collectively as the "Officer Defendants".

32.     The Board Defendants and the Officer Defendants are sometimes referred to herein collectively as the "Individual Defendants".

33.     Hut 8 and the Individual Defendants are collectively referred to herein as "Defendants."

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

7

34.     Hut 8 is a cryptocurrency mining company that provides digital asset mining and high-performance computing infrastructure solutions in Canada. The Company claims to be a "leading innovator" and the "first company to operate computing infrastructure across sites that mines Bitcoin and delivers cloud, colocation, and high-performance computing services to our enterprise customers." Additionally, Hut 8 manages services, engages in energy arbitrage, and operates traditional data centers.

35.     Before the Merger, in December 2022, USBTC acquired a 50% interest in King Mountain Joint Venture, a joint venture bitcoin mining production facility in King Mountain, Texas. King Mountain was previously owned by TZRC LLC ("TZRC"). For the three months ended September 30, 2023, the King Mountain Joint Venture posted self-mining revenue of $6.7 million, hosting services revenue of $13.3 million, and cost reimbursement revenue of $12.3 million.

36.     On February 6, 2023, Legacy Hut and USBTC entered an agreement proposing an all-stock merger. On November 30, 2023, Legacy Hut and USBTC completed the Merger, whereby each Legacy Hut shareholder received 0.2 shares of Hut 8 common stock, while each USBTC shareholder received 0.6716 shares of Hut 8 common stock.  On December 4, 2023, Hut 8 shares began trading on the NASDAQ.  As a result of the Merger, King Mountain Joint Venture became a part of the Company.

37.     During the Relevant Period, the Individual Defendants breached their fiduciary duties throughout the Relevant Period by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operation, and prospects. Specifically, the Individual Defendants willfully

or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, inter alia, that: (1) one of USBTC's biggest shareholders was an "undisclosed related party;" (2) USBTC's main asset and premier mining location, King Mountain Joint Venture, which became the property of Hut 8 by dint of the Merger, was not a financially stable asset, since it historically failed to provide energy and high-speed internet – core necessities for a data mining venture; (3) King Mountain Joint Venture had certain interest expenses that were not properly accounted for, making it appear as if King Mountain Joint Venture would be more profitable to Hut 8 than it actually was; (4) the profitability of certain USBTC assets was exaggerated; and (5) as a result, the Merger posed a significant risk to Hut 8's financial stability. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

38.     On November 9, 2023, Hut 8 filed a Form 424B3 with the SEC, which forms part of the Merger Prospectus (the "Prospectus") which described USBTC, in relevant part, stating:

> USBTC has several revenue streams: self-mining, hosting, managed infrastructure operations and equipment sales. Self-mining refers to all USBTC-owned machines that contribute computing power to mining pools in exchange for Bitcoin. Hosting refers to USBTC operating third party-owned machines at its sites in exchange for a hosting fee. Managed infrastructure operations refers to USBTC operating thirdparty-owned Bitcoin mining sites, leveraging its purpose-built site management software along with the curtailment platform, in exchange for a property management fee. Equipment sales refers to USBTC selling mining or infrastructure equipment to third-parties.

> USBTC owns and operates a Bitcoin mining facility in Niagara Falls, New York with access to approximately 50 MW of electricity (the "**Alpha Site**"). In December 2022, USBTC acquired from Compute North Member LLC ("**CN Member**") their entire membership interest in TZRC LLC, representing 50% of all issued and outstanding membership interests in the King Mountain JV with NextEra. The King Mountain JV owns a Bitcoin mining site in Upton County, Texas with access to

approximately 280 MW of electricity (the "**Echo Site**"). The Echo Site is co-located behind-the-meter at a wind farm.

39. The Prospectus describes the energy output available pursuant to the Merger:

Renewable energy sources powering USBTC's owned and operated sites include renewable energy and zero carbon emission energy from wind, hydro, and nuclear sources. As of June 30, 2023:

•   Alpha Site at Niagara Falls is fueled by a minimum of approximately 91% zero carbon emission energy sources;

•   Charlie Site in Nebraska is powered by more than 56% zero carbon emission sources, including 42.3% nuclear, 7.4% wind and 6.4% hydro; and

•   The Echo facility at King Mountain is co-located behind the meter at a wind farm, and at peak wind generation periods can draw up to 100% of the energy the wind project produces to power mining and hosting; the rest of the time, the energy is sourced from ERCOT which includes more than 40% zero carbon emission sources.

40. The Prospectus purported to warn of the risks of a loss of internet connectivity:

***USBTC may face risks of Internet disruptions, which could have an adverse effect on the price***

***of Bitcoin***.

A disruption of the Internet may affect the use of Bitcoin and subsequently the value of USBTC's securities. Generally, Bitcoin and USBTC's business of mining digital assets is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of Bitcoin and USBTC's ability to contribute computing power to pools that mine Bitcoin.

41. The Prospectus reported selected historical consolidated financial data of USBTC:

10

| (in thousands of US dollars) | | Year Ended June 30, | | |
|---|---|---|---|---|
| | | 2023 | | 2022 |
| **Consolidated Statement of Operations Data:** | | | | |
| Revenue: | | | | |
| Revenue, net – cryptocurrency mining | $ | 49,247 | $ | 68,164 |
| Mining equipment sales | | 3,635 | | — |
| Management fees | | 7,551 | | — |
| Cost reimbursements | | 5,247 | | — |
| Hosting services | | 16,480 | | 5,566 |
| Total revenue | | 82,160 | | 73,730 |
| Costs and expenses: | | | | |
| Cost of revenues (exclusive of depreciation and amortization shown below) | | | | |
| Services | | 40,000 | | 25,783 |
| Mining Equipment | | 3,112 | | — |
| Depreciation and amortization | | 18,779 | | 11,591 |
| General and administrative | | 27,789 | | 31,325 |
| Impairment of cryptocurrency | | 3,703 | | 30,301 |
| Realized (gain) on sale of cryptocurrency | | (4,577) | | (5,455) |
| Impairment of long-lived assets | | 63,574 | | — |
| Legal settlement | | (1,531) | | — |
| Total costs and expenses | | 150,849 | | 93,545 |
| Operating loss | | (68,689) | | (19,815) |
| Other expense: | | | | |
| Interest expense | | (27,935) | | (6,919) |
| Equity in earnings (losses) of unconsolidated joint venture | | 6,132 | | — |
| Gain on debt extinguishment | | 23,683 | | — |
| Total other income (expense) | | 1,880 | | (6,919) |
| Loss before income tax benefit (provision) | | (66,809) | | (26,734) |
| Income tax benefit (provision) | | 1,198 | | (5,069) |
| Net loss | $ | (65,611) | $ | (31,803) |
| Basic and diluted net loss per share | $ | (1.52) | $ | (0.91) |
| Basic and diluted weighted average number of shares outstanding | | 43,133,307 | | 34,863,338 |
| **Additional Financial Data** | | | | |
| Adjusted EBITDA[1] | $ | 35,926 | $ | 7,240 |

| (in thousands of US dollars) | | As of June 30, 2023 |
|---|---|---|
| **Consolidated Balance Sheet Data:** | | |
| Cash | $ | 10,379 |
| Cryptocurrency, net | | 851 |
| Total assets | | 189,997 |
| Notes payable, less current portion | | 149,891 |
| Total liabilities | | 162,624 |
| Additional paid-in capital | | 35,368 |
| Accumulated deficit | | (106,498) |
| Total stockholders' equity | | 27,373 |
| Total capitalization[1] | | 177,264 |

42.     On December 11, 2023, the Company announced an Operations Update for November 2023 in a press release which reported the Company had, as of November 2023: 839 Megawatts total energy capacity under management, 207,399 total deployed miners under management, 75,078 Deployed miners self-mining, 166,775 deployed miners under management for managed services, and 76,737 deployed miners under management for hosting.

43.     On December 19, 2023, the Company submitted its financial results on Form 10-Q for the quarterly period ended September 30, 2023 (the "3Q23 10-Q"). The 3Q23 10-Q contained the following summary of USBTC and King Mountain JV:

**King Mountain JV**

On December 6, 2022, one of USBTC's subsidiaries acquired a 50% membership interest in the King Mountain JV and assumed the King Mountain JV's senior Note (the "King Mountain JV Senior Note"). USBTC acquired the 50% membership interest through a competitive auction process in connection with the Chapter 11 bankruptcy filing of Compute North. ***The King Mountain JV has self-mining and hosting operations at the King Mountain location. USBTC has concluded that the King Mountain JV will be accounted for with the equity method of accounting.*** USBTC's 50% portion of monthly distributions from the King Mountain JV will be swept to pay down the King Mountain JV Senior Note. For additional information on the King Mountain JV Senior Note, see below. Self-mining revenue, hosting services revenue and cost reimbursement revenues for the King Mountain JV was $6.7 million, $13.3 million and $12.3 million, respectively, for the three months ended September 30, 2023, which represented 100% of the King Mountain JV's revenue during the period.

44.     The 3Q23 10-Q stated the following concerning related party transactions:

Related parties are defined as entities related to the Company's directors or main shareholders as well as equity method investment entities. ***The Company provides services to TZRC, an equity method investment entity*** (refer to Note 9 for additional information on the equity method investment entity), in exchange for fees under a PMA.

45.     The 3Q23 10-Q reported income derived from King Mountain JV:

Table of Contents

**U.S. Data Mining Group, Inc. and Subsidiaries**
**Notes to Unaudited Condensed Consolidated Financial Statements**

A summarized consolidated income statement and balance sheet for TZRC as of September 30, 2023 follows:

Condensed Consolidated Income Statement

| | Three Months Ended September 30, 2023 |
|---|---|
| Revenues, net | $ 32,279 |
| Gross profit | $ 17,305 |
| Net income | $ 665 |
| Net income attributable to investee | $ 303 |

Condensed Consolidated Balance Sheet

| | As of September 30, 2023 |
|---|---|
| Cash | $ 29,300 |
| Current assets | $ 41,022 |
| Noncurrent assets | $ 202,764 |
| Current liabilities | $ 26,371 |
| Noncurrent liabilities | $ 15,651 |
| Members' equity | $ 201,764 |

## Note 10. Notes Payable

The following is a summary of the Company's secured promissory notes as of September 30, 2023 and June 30, 2023:

Notes Payable – September 30, 2023:

| Issuance Date | Maturity Date | Interest Rate | Principal * | Current Portion |
|---|---|---|---|---|
| **Anchorage Loan** | | | | |
| February 3, 2023 | February 2, 2028 | 14.00 % $ | 46,555 $ | 985 |
| **TZRC Secured Promissory Note** | | | | |
| December 6, 2022 | April 8, 2027 | 15.25 % | 84,292 | — |
| **Third Party Note** | | | | |
| December 6, 2022 | December 5, 2027 | 18.0 % | 10,985 | — |
| | | Totals $ | 141,832 $ | 985 |

\* = Net of debt issuance costs which totaled approximately $3.7 million.

Notes Payable – June 30, 2023:

| Issuance Date | Maturity Date | Interest Rate | Principal * | Current Portion |
|---|---|---|---|---|
| **Anchorage Loan** | | | | |
| February 3, 2023 | February 2, 2028 | 14.00 % $ | 48,587 $ | 1,299 |
| **TZRC Secured Promissory Note** | | | | |
| December 6, 2022 | April 8, 2027 | 15.25 % | 92,102 | — |

46.     On January 5, 2024, the Company announced an Operations Update for December 2023 in a press release which stated in relevant part, that the Company held, as of December 2023:

> 839 Megawatts total energy capacity under management, 205,759 total deployed miners under management, 73,943 Deployed miners self-mining, 166,347 deployed miners under management for managed services, and 76,734 deployed miners under management for hosting.

47.     The above statements identified in ¶¶ 35-44 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (a) one of USBTC's largest shareholders is an undisclosed related party; (b) USBTC's core asset has historically failed to provide energy and high-speed internet; (c) the profitability of certain USBTC assets were overstated; and (d) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

48.     On January 18, 2024, J Capital Research published a report entitled *The Coming HUT Pump and Dump* with a subheading which read "management hiding stock ownership through undisclosed related party, a stock promotor cabal, and a host of left-for-dead assets" (the "Report").  The Report alleged that USBTC's CEO, Defendant Ho, may be hiding ownership shares through his partner, Anna Kudrjasova, *via* her company Anaya Capital Corp.:

14

Documents for different companies list the same address for Ho and Kudrjasova, in Dubai at
5709 Cayan Tower, Dubai Marina, Dubai, UAE 643671.

"(31) Anna Kudrjasova has sole voting and dispositive power over the securities held for
the account of this selling stockholder, as director. The selling stockholder's address is
5709 Cayan Tower, Dubai Marina, Dubai, UAE 643671."

U.S. Gold Corp Prospectus

"21 The address that Michael Ho gave as President, Secretary, and Treasurer of both
Kairos and Ingenium Global Inc. – 5709 Cayan Tower in Dubai – is different from the
address he gave to the State of Florida in registering Prive."

Takata v RIOT page 65[9]

49.     The Report describes how "[t]his is particularly significant, because Ho has
committed to a lock-up of 65% of his shares – but not hers.  Anaya Capital appears to hold about
3.7 mln shares."  The Report details that Ho and Kudrjasova have been associated for nearly a
decade:

The two have been associated for about a decade. Back in 2014, the Vancouver Sun identified
Ho and Kudrjasova as a couple.

*HO A GO-GO: Folks filled a 3,000-square-foot, Boundary-at-
Kitchen showroom recently at a debut party for Shanghai-
born Michael Ho's Vancouver Motorcars firm. Pushed outside
were Ferraris, sporty Audis and Ho's Mercedes-Benz SLR 6.3
on which he must pay a hefty insurance premium. That's
because, like Latvia-born personal and business partner Anna
Kudrjasova, he is 20 years old but already a seasoned
entrepreneur. The two sold their Ritzypin online womenswear
firm recently when, despite satisfactory sales margins, local
manufacturing was barely profitable.*

11

50.     The Report also alleged that King Mountain JV "has historically failed to provide energy and high-speed internet," and described an extensive history of a lack of connectivity, despite the fact Bitcoin mining requires constant connectivity:

> **The King Mountain JV has been plagued with connectivity problems**.  In its 2023 Annual Report, published on March 16, 2023, MARA reported "the company experienced significant production downtime in the second and third quarters . . . and delays in energization at King Mountain." MARA had 60,000 miners at the facility, but according to a Proof of Claim MARA filed in the Compute North bankruptcy case, the miners were never energized. MARA's Statement of Claim said that King Mountain lacked a high-speed internet connection

> * * *

> On November 23, 2022, **MARA, which was the largest customer for the King Mountain site, filed a motion stating that Compute North at King Mountain had failed to energize its miners and failed to provide an adequate internet connection**.

> * * *

> MARA also said that there was a **lack of high-speed connection at the facility**.

> * * *

> **USBTC itself was so disgruntled that it filed suit. Just one month before buying the King Mountain JV, USBTC filed an action against CN King Mountain LLC for failing to find a location where miners could be installed and energized**.

> * * *

> Our diligence suggests that the facility now uses a Starlink satellite network instead of a broad- band connection to access the internet. This is unheard of in the Bitcoin mining industry. Starlink is an expensive and unreliable choice for mining at scale. Said one interviewee who managed a large data center when asked if he would ever use Starlink as primary internet source for Bitcoin mining at scale, he said "never." [Emphasis added].

51.     The Report also alleged that the Company overstates profitability by failing to account for certain "interest expenses" concerning King Mountain JV:

The company is misleading on the profitability of the JV, with accounts showing $665,000 of profit while completely ignoring about the $3.2 mln interest expense incurred during the same period.

---

### U.S. Data Mining Group, Inc. and Subsidiaries
### Notes to Unaudited Condensed Consolidated Financial Statements

A summarized consolidated income statement and balance sheet for TZRC as of September 30, 2023 follows:

#### Condensed Consolidated Income Statement

**An apparently, albeit barely, profitable JV seems like good news**

| | Three Months Ended September 30, 2023 |
|---|---|
| Revenues, net | $ 32,279 |
| Gross profit | $ 17,305 |
| Net income | $ 665 |
| Net income attributable to investee | $ 303 |

### Note 10. Notes Payable

The following is a summary of the Company's secured promissory notes as of September 30, 2023 and June 30, 2023:

Notes Payable – September 30, 2023:

**Yet these JV numbers exclude the very expensive interest cost from a promissory note assumed with the acquisition of the JV - this cost is shown elsewhere in the company filings**

| Issuance Date | Maturity Date | Interest Rate | Principal * | Current Portion |
|---|---|---|---|---|
| *Anchorage Loan* | | | | |
| February 3, 2023 | February 2, 2028 | 14.00 % | $ 46,555 | $ 985 |
| | | | | |
| *TZRC Secured Promissory Note* | | | | |
| December 6, 2022 | April 8, 2027 | 15.25 % | 84,292 | — |
| | | | | |
| *Third Party Note* | | | | |
| December 6, 2022 | December 5, 2027 | 18.0 % | 10,985 | — |
| | Totals | | $ 141,832 | $ 985 |

\* = Net of debt issuance costs which totaled approximately $3.7 million.

17

52.     The Report also casted doubt on to other reported financials stating:

We are confused about how many miners USBTC has. The November 2023 Hut 8 operations update claims that USBTC had 46,225 Bitcoin miners deployed for October 2023, and yet at the end of September 2023, USBTC reported operating only 30,200 miners.

We find this ramp-up extremely unlikely, especially without disclosing new machine orders or deposits for new miners in USBTC's end September 2023 balance sheet. Remaining construction in progress was far less than the typical purchase value for that many extra machines. Is USBTC telling the truth?

53.     The Report further claimed that, without the merger with Hut 8, individual "highly familiar" with USBTC stated the USBTC would have been forced to undergo a structured bankruptcy:

One person highly familiar with USBTC told us, "without the merger, [USBTC] would have done a structured bankruptcy."

*  *  *

"The merger was a complete godsend for USBTC," someone deeply involved with the company told us. Without the merger, this person said, USBTC would have been bankrupt within weeks. "It was very much in the cards." *In early 2023, USBTC gave up almost half its miners, plus $20.7 mln and some other assets, in an apparent default*.

*  *  *

Our interviewee said that USBTC "begged" NYDIG to forgive the loan but soon after Christ- mas was forced to surrender assets. *Hut 8 managed to characterize this default as a $23.7 mln GAIN on debt extinguishment. But it had started out as a $24.2 mln LOSS that the company "fixed" through an accounting sleight of hand*. Abracadabra!  [Emphasis added].

54.     Finally, the Report concluded, based on a review of financial reports, "we estimate a value for USBTC that's as much as 70% less.  Typically, such egregious over-payments occur only when management is being enriched."  Further:

18

‣ We are highly skeptical that the King Mountain JV is worth the $105 mln paid by USBTC, given reports that the center at the time lacked both reliable power and internet.

Nevertheless, we assign what we believe to be an aggressive $105 mln valuation – the price USBTC paid for the facility. This is despite MARA's recent purchase of Granbury and Kearney, which indicates that the King Mountain JV would be worth only $64 mln.

‣ Our valuation of USBTC's Managed Infrastructure Operations (MIO) business is $51 mln, a generous 3x forward revenue.

\* \* \*

*In total, we value the USBTC operating assets at the high end at $219 mln. Not only do we suspect that USBTC overpaid for the King Mountain JV, but Hut 8 overpaid again, by a factor of four, for the same facility, along with the Niagara mining facility and the two managed-facility contracts*. New Hut issued 49.7 mln shares in exchange for all US- BTC stock – a value of about $495 mln at the time. Hut 8 also took on $160 mln in net debt plus around $90 mln in planned spending commitments ($40 mln for AI equipment and $50 mln in planned capital expenditure) in exchange for the USBTC and Legacy Hut assets.  [Emphasis added].

55.     On this news, Hut 8's stock price fell $2.16, or 23.3%, to close at $7.12 per share

on January 18, 2024, on unusually heavy trading volume.

## THE COMPANY'S MANDATE OF THE BOARD

56.     The Company's Mandate to the Board states in relevant part:

**RESPONSIBILITIES AND DUTIES OF THE BOARD**

The Board is responsible for the stewardship of the Company and providing oversight as to the management of the business and affairs of the Company. It is management's duty to run the Company's business on a day-to-day basis. The Board is expected to focus on guidance and strategic oversight, with the goal of increasing long-term shareholder value. In discharging their duties, directors must act honestly and in good faith, with a view to the best interests of the Company. Directors must exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

The responsibilities and duties of the Board shall include the following:

19

### *Chief Executive Officer and Officers*

- Appointing the Chief Executive Officer (the "**CEO**") and, together with the CEO, developing a written position description for the role of the CEO.
- Delegate to the CEO and other senior executives the authority over the day-to-day management of the business and affairs of the Company.
- Developing the corporate goals and objectives that the CEO is responsible for meeting and reviewing the performance of the CEO against such corporate goals and objectives.
- Taking steps to satisfy itself as to the integrity of the CEO and other executive officers and that the CEO and other executive officers create a culture of integrity throughout the organization.
- Succession planning for the CEO and other key personnel.
- Approving the compensation of the CEO upon recommendation of the Compensation Committee.

### *Financial Reporting*

Approving: the annual financial statements and related Management's Discussion and Analysis, and their filing and disclosure; and the Company's annual earnings press releases, including any pro forma or non-GAAP information included therein, and their filing and disclosure.

- Reviewing and monitoring, with the assistance of the Audit Committee:

i.    the quality and integrity of the Company's financial statements and related information, including the Company's accounting and financial reporting processes and the audit of the Company's financial statements;

ii.   the external reporting of the Company's financial and operating performance in compliance with all regulatory and statutory requirements; and

iii.  the independence, qualifications, appointment and performance of the Company's external auditor.

### *Financial Reporting Processes, Accounting Policies and Internal Controls*

- Reviewing and monitoring, with the assistance of the Audit Committee:

i.    he adequacy and effectiveness of the Company's system of internal controls over financial reporting, including any significant deficiencies and significant changes in internal controls;

ii. the quality and integrity of the Company's external financial reporting processes;

iii. the Company's disclosure controls and procedures, including any significant deficiencies in or material non-compliance with, such controls and procedures; and

iv. the relationship of the Audit Committee with other committees of the Board and management.

### *Ethical and Legal Compliance and Risk Management*

- Reviewing and approving the Company's Code of Business Conduct and Ethics.
- Reviewing and monitoring:

i. compliance with the Code of Business Conduct and Ethics and other ethical standards adopted by the Company; and

ii. the Company's compliance with applicable legal and regulatory requirements, though notwithstanding the foregoing and subject to applicable law, nothing contained in this Mandate is intended to require the Board to ensure the Company's compliance with applicable laws or regulations.

- In conjunction with management, identifying the principal risks of the Company's business and reviewing and monitoring management's implementation of appropriate systems to seek to effectively monitor, manage and mitigate the impact of such risks.

## THE COMPANY'S CORPORATE GOVERNANCE PRINCIPLES AND GUIDELINES

57. The Company's Corporate Governance Principles and Guidelines state in relevant part:

### *Board and Committee Mandates*

The Board is responsible for the stewardship of the Company and has adopted the Board Mandate setting out the Board's responsibilities with respect to the stewardship and oversight of the Company and providing for the establishment of standing committees of the Board (which committees currently consist of the Audit Committee, the Compensation and Talent Development Committee and the Nominating, Environmental, Social and Governance Committee (the "**NESG Committee**"). The mandates of these committees are set out in their respective charters.

The Board shall review and assess, or may delegate to the NESG Committee to review and assess, the adequacy of the Board and committee mandates and recommend any proposed changes to the Board for consideration.

Every charter must be disclosed in accordance with the listing standards, policies and guidelines of relevant stock exchanges and securities laws, including, if applicable, the Toronto Stock Exchange and National Instrument 58-101 – *Corporate Governance Guidelines*, and made publicly available on the Company's website.

***Corporate Governance*** The Board has delegated responsibility to the NESG Committee for developing the Company's approach to corporate governance for the Board's approval, including recommending modifications to these Governance Guidelines for consideration by the Board.

<u>**THE COMPANY'S AUDIT COMMITTEE CHARTER**</u>

58.     The Company's Audit Committee Charter states in relevant part:

## I.     PURPOSE

The Committee's purpose is to assist the Board in its oversight of:

- the quality and integrity of the Company's financial statements and related information, including the Company's accounting and financial reporting processes and the audit of the Company's financial statements;
- the independence, qualifications, appointment and performance of the Company's external auditor (the "**external auditor**");
- the Company's disclosure controls and procedures, internal control over financial reporting, and management's responsibility for assessing and reporting on the effectiveness of such controls;
- the organization and performance of the Company's internal audit function;
- the Company's compliance with applicable legal and regulatory requirements; and
- the Company's enterprise risk management processes.

## II.     ACCESS TO INFORMATION AND AUTHORITY

In carrying out its duties and responsibilities, the Committee shall have the authority to:

- communicate directly with the external auditor and to meet with and seek any information it requires from employees, officers, directors or external parties;
- review the plan and any significant reports of the internal auditors and meet with persons responsible for the internal audit function;
- investigate any matter relating to the Company's accounting, auditing, internal control or financial reporting practices or anything else within its scope of responsibility;
- take whatever actions it deems appropriate, in its sole discretion, to foster an internal culture within the Company that results in the development and maintenance of a superior level of financial reporting standards, sound business risk practices and ethical behavior;
- obtain full access to all Company books, records, facilities and personnel; and
- at its sole discretion and at the Company's expense, retain and set the compensation of outside legal, accounting or other advisors, as necessary to assist in the performance of its duties and responsibilities.

The Company will provide appropriate funding, as determined by the Committee, for compensation to the external auditor, to any advisors that the Committee chooses to engage and for payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

*** 

## IV.    RESPONSIBILITIES AND DUTIES OF THE COMMITTEE

In addition to such other duties as may from time to time be expressly assigned to the Committee by the Board, the Committee shall have the following responsibilities and duties:

### *Financial Reporting*

- Prepare an audit committee report to be included in the Company's annual proxy circular.
- Prior to their public disclosure, review and discuss with management and, if applicable, the external auditor or the internal auditor:

  (i)      the Company's annual financial statements and the related MD&A, including the discussion of critical accounting estimates under the Generally Accepted Accounting Principles ("**GAAP**") included therein and, if appropriate, recommend to the Board the approval, filing and disclosure of such information;

23

(ii)     the Company's annual earnings press releases, including any pro forma or non-GAAP information included therein;

(iii)    the Company's quarterly unaudited financial statements and associated MD&A, including the discussion of critical accounting estimates included therein;

(iv)    the Company's quarterly earnings press releases, including any pro forma or non-GAAP information included therein;

(v)     the type and presentation of financial information and earnings guidance provided to analysts, ratings agencies and others;

(vi)    to the extent they include financial information extracted or derived from the Company's financial statements, other public reports or filings by the Company, including the Company's annual report on Form 10-K and proxy circular;

(vii)   internal controls (or summaries thereof) and the integrity of the financial reporting and related attestations by the external auditor of the Company's internal control over financial reporting;

(viii)  any significant difficulties encountered during the course of the audit, including, but not limited to, any restrictions on the scope of work or access to required information; and

(ix)    the Company's guidelines and policies governing the process of risk assessment and risk management.

## **DUTIES OF THE DIRECTOR DEFENDANTS**

59.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

60.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

61.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and

good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

62.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

63.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about

the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

64.      Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

65.      The Director Defendants breached their duties of loyalty and good faith by

26

causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

66.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Director Defendants.

67.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

68.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

69.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

70.     The Company Board is currently comprised of nine (9) members – including Defendants Tai, Ho, Genoot, Hefti, Flinn, Shattuck, O'Neal, Wilkinson, and Rickertsen. Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.,* five (5), cannot exercise independent objective judgement about whether to bring this action or whether to

vigorously prosecute this action.

71.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

72.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

73.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

74.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

### Defendant Genoot

75.     The principal professional occupation of Defendant Genoot is his employment with the Company as its CEO, pursuant to which he has received and continues to receive substantial

monetary compensation and other benefits, and accordingly he is conflicted and cannot impartially consider a demand.

76.    The following table sets forth the total compensation of Defendant Genoot for the years 2022 and 2023:

|  | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 2022 | 250,000 | --- | 3,273,853 | --- | 1,940,218 | 5,464,071 |
| 2023 | 250,000 | --- | --- | 272,717 | --- | 522,717 |

77.    This lack of independence and financial benefits received by Defendant Genoot renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

78.    Defendant Genoot is not independent from Defendants Shattuck III, Rickersten and Ms. Wilkinson because they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO (Defendant Genoot).  The purpose of the Compensation Committee is to assist the Board in discharge of its responsibilities related to the compensation and benefits provided by the Company to its CEO and executive officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Genoot could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future. *See, e.g., Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993); *Steiner v. Meyerson*, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995); *In re The Student Loan Corp. Derivative Litig.*, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 275 (S.D.N.Y. 2006) (applying Delaware law) (fact of director's deriving his principal income from employment by the corporation makes it improbable that he could perform his fiduciary duties

without bring influenced by his overriding personal interest) (citing *In re General Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *8 (Del. Ch. May 4, 2005)).

**Defendant Ho**

79.     The principal professional occupation of Defendant Ho is his employment with the Company as its CSO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits, and accordingly he is conflicted and cannot impartially consider a demand.

80.     The following table sets forth the total compensation of Defendant Ho for the years 2022 and 2023:

|  | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 2022 | --- | --- | 2,976,127 | --- | 2,102,790 | 5,078,917 |
| 2023 | --- | --- | 272,717 | --- | 250,000 | 522,717 |

81.     This lack of independence and financial benefits received by Defendant Ho renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

82.     Defendant Ho is not independent from Defendants Shattuck III, Rickersten and Ms. Wilkinson because they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CSO (Defendant Ho).  The purpose of the Compensation Committee is to assist the Board in discharge of its responsibilities related to the compensation and benefits provided by the Company to its CSO and executive officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Ho could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.  *See, e.g.*, *Rales v. Blasband*, 634 A.2d

927, 937 (Del. 1993); *Steiner v. Meyerson*, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995); *In re The Student Loan Corp. Derivative Litig.*, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 275 (S.D.N.Y. 2006) (applying Delaware law) (fact of director's deriving his principal income from employment by the corporation makes it improbable that he could perform his fiduciary duties without bring influenced by his overriding personal interest) (citing *In re General Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *8 (Del. Ch. May 4, 2005)).

83.     Further, for the period December 4, 2020 through January 5, 2021, USBTC entered into secured promissory notes with various existing investors of USBTC, including USBTC's Chief Executive Officer and director, Michael Ho, a family member of Mr. Ho and a family member of USBTC's President and director, Asher Genoot.  Additionally, USBTC entered into secured promissory notes with Jonathan Honig, a former beneficial owner of more than 5% of the voting securities of USBTC at the time of the transaction, and an entity controlled by Jonathan Honig (collectively referred to as "Honig"), Erica Groussman, a former beneficial owner of more than 5% of the voting securities of USBTC at the time of the transaction ("Mrs. Groussman") and an entity controlled by an immediate family member of Tara Stetson (the entity, together with Mrs. Stetson, collectively referred to as the "Stetsons"), a former beneficial owner of more than 5% of the voting securities of USBTC at the time of the transaction. The principal balances of the notes totaled approximately $5.9 million. Of the $5.9 million in notes, approximately an aggregate of $1.12 million of the notes were held by Mr. Ho and his family member, $0.1 million was held by Mr. Genoot's family member, approximately $2.4 million was held by Honig, $0.25 million was held by Mrs. Groussman and $0.25 million was held by the Stetson Entity.

**Defendants Flinn, O'Neal and Shattuck**

84.     During the Relevant Period, Defendants Flinn, O'Neal, and Shattuck served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

85.     Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### (Against The Director Defendants for Breach of Fiduciary Duties)

86.     Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

87.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

88.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

89.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

90.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

91.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

### SECOND CAUSE OF ACTION

#### (Against The Director Defendants for Gross Management)

92.     Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

93.     By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

33

94.      As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

95.      Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

### THIRD CAUSE OF ACTION

### (Against the Director Defendants for Waste of Corporate Assets)

96.      Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.      The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

98.      As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

99.      As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

100.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

### (Against The Individual Defendants For Unjust Enrichment)

101.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.     By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

103.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

104.     Plaintiff, as a shareholder and representative of the Company seeks restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

105.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

**<u>FIFTH CAUSE OF ACTION</u>**

**(Against The Individual Defendants For Violations of § 10(b)<br><u>of the Exchange Act and Rule 10b-5</u>)**

106.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.     The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

108.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

109.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

110.    The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of Hut 8 were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

111.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Hut 8, their control over, and/or receipt and/or modification of Hut 8's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Hut 8, participated in the fraudulent scheme alleged herein.

112.     As a result of the foregoing, the market price of Hut 8 common stock was artificially inflated.  In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of Hut 8 common stock in purchasing Hut 8 common stock at prices that were artificially inflated as a result of these false and misleading statements and was damaged thereby.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgement as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 19, 2024

                                           Respectfully submitted,

**EGGNATZ | PASCUCCI**

By: */s/Joshua H. Eggnatz*
Joshua H. Eggnatz
Michael J. Pascucci
7450 Griffin Rd, Ste. 230
Davie, FL 33314
Telephone: (954) 889-3359
Facsimile: (954) 889-5913
Email: JEggnatz@JusticeEarned.com
Email: Mpascucci@JusticeEarned.com

***GAINEY McKENNA & EGLESTON***
Thomas J. McKenna
Gregory M. Egleston
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***